384 P.2d 684

The **MOUNTAIN STATES TELEPHONE AND TELEGRAPH COMPANY**, a corporation, Plaintiff-Appellee and Counter-Appellant,

v.

**SUBURBAN TELEPHONE CO.**, a corporation, Defendant-Appellant and Counter-Appellee,

and

Mrs. Joe Tadlock et al., Plaintiff-Intervenors and Appellees.

No. 7285.

Supreme Court of New Mexico.

June 24, 1963.

Rehearing Denied Sept. 9, 1963.

See also 384 P.2d 690.

Bigbee & Byrd, Santa Fe, Akolt, Shepherd & Dick, Denver, Colo., for appellee and counter-appellant.

Denny & Glascock, Gallup, Baird & Lundquist, Zion, Ill., for appellant and counter-appellee.

Ertz, Beasley & Colberg, Albuquerque, for intervenors-appellees.

CARMODY, Justice.

We are here concerned with a controversy between two competing telephone companies. Neither party to the case being satisfied with the trial court's decision, one appealed and the other cross-appealed.

For clarity, Suburban Telephone Company, (which is the appellant and cross-appellee) will be referred to merely as "Suburban," and The Mountain States Telephone and Telegraph Company (appellee and cross-appellant) will be simply termed "Mountain States."

Mountain States brought suit against Suburban in the District Court of Catron County, to enjoin Suburban from con-

structing or operating any telephone facilities in Quemado, New Mexico, and the surrounding rural area. Alternatively, Mountain States sought an order of the court for a certificate of public convenience and necessity for the duplication of services in Quemado and its area if the court should find that Suburban was already engaged in rendering telephone service to this community, provided Suburban did not, within ninety days, make such changes and additions to its plant as might be necessary to meet the public's needs.

Suburban answered and counterclaimed, generally denying the allegations of Mountain States' complaint and affirmatively alleging that it had first constructed telephone facilities in the area. The counterclaim alleged existing facilities in Quemado and that Mountain States threatened to build facilities in the said area; therefore, Suburban sought an injunction. Subsequently, upon motion, intervenors, residents of the general area, were allowed to file a complaint in intervention over the objection of Suburban, this complaint generally seeking the same relief as that sought by Mountain States. Following a lengthy trial, the court rendered its decision, which denied both injunctions but determined that Suburban's service in Quemado and surrounding area was inadequate and that this company would have ninety days to furnish adequate service; and, if unable, then, after hearing, a certificate of convenience and necessity would issue to Mountain States.

Summarizing the facts found by the trial court, it appears that Mountain States for many years has provided general telephone service throughout the state of New Mexico, operating an exchange at Magdalena, New Mexico (some 63 miles east of Datil), and beginning in July 1953 served, through the Magdalena exchange, a ranchers' line which ran westward to a point twelve miles west of Datil; that northern Catron County, along Highway 60, had no telephone service other than the ranchers' line prior to July 1961; that in December 1960, Suburban acquired a telephone line running from Quemado to Salt Lake, New Mexico, and continued to maintain it thereafter; that on May 25, 1961, Suburban completed construction of a temporary telephone line from Fence Lake, New Mexico (approximately 40 miles north of Quemado), and commenced limited service to Quemado on or about May 29, 1961, and long-distance service about the same time; that Mountain States commenced serving the field or territory in July 1953, by virtue of the exchange service over the ranchers' line, and that in October 1959, Mountain States made a definite commitment to the people of northern Catron County that local exchange service would be provided for Datil and Quemado; that following this commitment, Mountain States proceeded with reasonable diligence to plan, construct and connect the

necessary facilities into the area, cutting the Datil exchange into service on July 23, 1961, and rural service out of Datil to customers in Pietown, in October, and filing tariffs with the State Corporation Commission; that Mountain States had not established local exchange service in Quemado, but at the time of trial had completed construction to within three miles thereof; that the actual purchase of the ranchers' line by Mountain States was in September 1960, and Mountain States immediately started rehabilitiation and improvement of the facilities; that in the month of June, 1960, Mountain States approved a comprehensive plan for the establishment of exchange and toll service for all of the northern Catron County area. The court then found that while this work was in progress by Mountain States, Suburban, without first applying for a certificate of convenience and necessity, extended its temporary line into Quemado; that the local service offered by Suburban failed to win acceptance by the prospective customers, and that Suburban was aware of the plans of Mountain States to extend its facilities westward from Datil and to furnish service to the whole of northern Catron County, and knew that this plan had been completed except for the construction of a distribution plant for the local exchange and rural ranch areas surrounding Quemado. The court further found that there would be a duplication of service if Suburban constructed a toll line

east to Datil; that there is a well-defined need for acceptable local exchange service in Quemado and the surrounding area, and that the majority of the prospective customers have indicated a preference for Mountain States; that Suburban has a physical plant and exchange at Quemado, but the court found that the physical properties and services were inadequate. Finally, it found that if Mountain States and Suburban both served Quemado, there would be a duplication of service, but that at that time there was no duplication of service, since Suburban's line runs south from Gallup to Quemado, and Mountain States' line runs generally along Highway 60.

The court made one other finding, which is of major importance and is the decisive issue in the case. This finding reads as follows:

"6. One of the issues in this case is the determination of what is meant by the statutory language in Section 69–8–1, 1953 Compilation, 'field or territory.' The Court finds that by the pleadings of the parties and the actions of the residents in Northern Catron County, that it appears all parties concerned have considered the whole of Northern Catron County as one integral unit. The Court accepts the proposition that all that part of Northern Catron County, along Highway No. 60,

and both sides thereof, should be treated as a field or territory."

██ The above facts as found by the court are set out in appellant's brief in chief, in which an attempt is made to attack most of them as contrary to the evidence. The attack, such as it is, directs our attention to the contrary evidence, but neglects to point out the evidence in support of the findings. This is in direct violation of Rule 15(6) (§ 21–2–1(15) (6), N.M.S.A.1953), Minor v. Homestake-Sapin Partners Mine, 1961, 69 N.M. 72, 364 P.2d 134, and we will not disturb the findings of the trial court where the rule is not observed. To compound appellant's violation of the rule, it was conceded upon oral argument by appellant's out-of-state counsel who prepared the brief in chief, that all of the evidence, or the substance thereof, bearing upon the findings had not been included in the brief, nor were transcript references made where we could locate such evidence. Therefore, in such a situation, the trial court's findings as summarized hereinabove are the facts upon which our decision must be based. Petty v. Williams, 1963, 71 N.M. 338, 378 P.2d 376; Lance v. New Mexico Military Academy, 1962, 70 N.M. 158, 371 P.2d 995.

For a proper understanding of the situation, it is felt necessary to refer to the geography, population and industry of Catron County, New Mexico. This county, located in the extreme westerly part of New Mexico, is the largest in area of any in the state, having some 6,898 square miles but with a population of only 2,773 as shown by the 1960 census. A large part of the county is mountainous and the people living therein are principally concerned with stock raising and mining. Traversing the northerly quarter of the county is U. S. Highway 60, which, within the county, is some ninety miles in length. On the highway, there are three small communities of Datil, Pietown and Quemado, which are twenty-one miles apart, in the order given. Although the Bureau of Census apparently has not compiled figures on the population of these three communities, it would seem, when we consider the total votes cast in the general election of 1962, that the general area served by Highway 60 has approximately one-third of the total population of the county. Thus, it can be safely assumed, we believe, that the northern area of Catron County with which this lawsuit is concerned has a population of somewhat less than 1,000 persons. Figures are not available to indicate how many of these people live in any specific area, but, based upon the voting population, it appears that the population of the Quemado precinct is about equal to that of both Datil and Pietown. We are not advised, however, as to what portion of the voting public live in Quemado itself, as distinguished from ranchers residing in out-of-the-way areas. Highway 60 is the only paved road connecting this part of the county with the rest of New Mexico, other

than a paved highway running southward from the community of Datil to Reserve (the county seat) and thence to southwestern New Mexico. More than 100 miles to the north of both Quemado and Pietown is the city of Gallup. Roads to Gallup, however, are only partially improved, and a substantial portion is unimproved.

This explanation is to make evident to anyone not familiar with this part of New Mexico that the area is very sparsely populated—the whole of Catron County has a population per square mile of only 0.4. It should also serve to make manifest, as it must have been to the trial court, that the residents have a common bond of interest by reason of their location on or near Highway 60, and the fact that their normal and usual trade area is not only among themselves but to the east at Magdalena, Socorro and Albuquerque, and to the west into Arizona, but *not* to the north.

The whole issue of the case relates to the construction of the statute (being §§ 69–8–1, 69–8–2 and 69–8–3, N.M.S.A.1953) as it applies to the facts of the case. For convenience and understanding, the three sections above-mentioned are set out in full:

"69–8–1. Duplication of certain public utilities prohibited.—It shall hereafter be unlawful to construct, own, operate, manage, lease or control any plant or equipment for the furnishing of any public utility service contemplated by article XI, section 7 of the Constitution of the state of New Mexico, in the same municipality, field or territory where there is in operation any such plant or equipment engaged in a similar service unless public convenience and necessity shall require such second plant or equipment.

"69–8–2. Determination of convenience and necessity upon petition.— Such question of public convenience and necessity shall be determined upon petition and hearing in the district court of the county wherein the proposed second plant or equipment is to be operated. Any interested person, corporation, municipal corporation, partnership or association, proposing to construct or operate such second plant or equipment, shall first file a petition in said district court, to which petition the authority proposing to authorize the construction of such second plant or equipment and the owner, manager or operator of the plant and equipment then in operation shall be made parties. The petition shall set up the reasons why public convenience and necessity require such second plant or equipment. If the judgment of the court upon said hearing shall be that public convenience and necessity do not require the proposed second plant or equipment, the petition shall be dismissed at the cost of the petitioners; but if the court shall find that public

convenience and necessity require that additional plant or equipment is necessary, then it shall issue an order in the alternative directing the owner, manager or operator of the plant and equipment then in operation to make such changes and additions in plant as may be necessary to meet the public convenience and necessity within ninety (90) days, or such other additional time as the court may set, and if such changes or additions are not made within the time ordered by the court, then a certificate of public convenience and necessity for such second plant and equipment may issue.

"69–8–3. Injunction when issued. —When it shall appear that any second plant or equipment, as above described, is about to be authorized or constructed contrary to the terms of this act [69–8–1 to 69–8–6], or that any municipal corporation is attempting to construct, own, operate, manage or control any second plant or equipment contrary to the terms of this act, the owner or owners, operator or operators, manager or managers, lessee or lessees of any plant or equipment then in operation in said municipality, field or territory and engaged in a similar service, may apply to the district court of the county in which said authorization, construction or operation is threatened for a restraining order and injunc-

tion against the construction, owning, operation, management, leasing or control of ᴄuch second plant or equipment, and the court shall make such restraining order and injunction perpetual unless it be established at the hearing before said court that public convenience and necessity require such second plant and equipment, in which case the court shall grant the alternative order as specified in section 2 [69–8–2] hereof."

Inasmuch as none of the named communities are what ordinarily would· be termed a "municipality," the key words to be construed are "field or territory where there is in operation any such plant or equipment engaged in a similar service."

■ Although there is little definitive material from which a definition of "field" or "territory served" may be ascertained, an exhaustive search of the books and texts serves to give us some guidelines by which certain generalities may be drawn. "Territory" is defined in Webster's Third New International Dictionary as "a geographical area of indeterminate extent; region; tract." One of the definitions of "field," in the same source, is:

"* * * a limited or demarcated area of knowledge or endeavor to which pursuits, activities, and interests are confined, often one determinedly chosen at a certain time or by the necessities of a situation."

In the sense used in the statute, the terms "field" and "territory" are analogous to the term "area," and most of the cases seem to discuss "area" more frequently than "field" or "territory."

In Puget Sound Nav. Co. v. Director, etc., of Pub.Works, 1929, 152 Wash. 417, 278 P. 189, the court said:

"The question, what is territory already served, is a question of fact."
and, further:

"* * * Before that fact can be determined, it requires consideration of economic conditions, ofttimes involving expert testimony; * * * the question of population warranting additional facilities * * *."

In Utah Power & Light Co. v. Public Service Commission, 1952, 122 Utah 284, 249 P.2d 951, the inquiry was whether the existing utility "professed or agreed to serve" the disputed area. The Kentucky court, in H–F–C Rural Tel. Co-op. Corp. v. Public Service Com'n (Ky.App.1954), 269 S.W.2d 231, agreed that the "area" was served by the existing utility if the surrounding territory was reasonably well covered by its service, despite gaps therein, finding it "proper *under the circumstances* to treat the territories as part of the area that was being furnished service." In Re Bolton, 9 P.U.R.3d 140 (Ohio Public Utilities Commission 1955), the commission said:

"* * * We hold that the boundary map is not controlling and is only one factor of several to be considered. * * It is, of course, axiomatic that a utility is obliged to serve without preference or discrimination in the area in which it purports to operate. * * *

"It may be said in passing that the determination of 'the operating area' of any utility is always a difficult matter and presents this commission with a difficult question of fact. It also appears that these determinations occur most frequently in the telephone industry. * * *

\*     \*     \*     \*     \*     \*

"* * * In this proceeding the commission must determine, as the basic issue, where the operating areas of the parties abut. * * * In making this determination it does, of course, consider the filed boundary maps but it must also take into account many other factors, such as the existence or non-existence of service facilities in the disputed area, which company or companies provide the service, the circumstances and conditions under which service is offered, and the community interest of the area involved."

See, also, Public Service Co. of Colorado v. City of Loveland, P.U.R.1928C 35 (Colorado Public Util. Commission 1928), for pertinent discussion and definition of "territory" and "serve."

■ It is apparent that the words "field or territory" as used in the statute might very properly have been found by the trial court to be all of that part of northern Catron County along Highway 60 and both sides thereof. The finding to that effect is amply supported by the evidence.

■ The next question which arises in construing the statute concerns which of the parties actually had in operation any plant or equipment. The trial court found that Suburban's establishment of a *telephone exchange* at Quemado was first in time. As of the time the complaint was filed, Mountain States did not have a telephone exchange in the area, but it was serving part of Catron County through the facilities of the ranchers' line from its telephone exchange at Magdalena, which exchange is actually located in Socorro County and not in any part of Catron County. However, the ranchers' line had been operated by Mountain States since 1953, and, other than the telephone wires themselves, all *equipment* was owned by Mountain States. It is worthy of note that the trial court found the purchase of the ranchers' line by Mountain States to have been made in September 1960, although from the evidence it is quite apparent that the actual transfer did not occur until shortly after Suburban commenced its service to Quemado. As we view the situation, however, the date of the actual transfer is not determinative, and

Mountain States, prior to the filing of the lawsuit, did have equipment engaged in service in the contested area. In a sparsely populated territory such as this, it could hardly be expected that in each small community there would be located a "plant," as contended by Suburban. Actually, Suburban would claim that the operation of a plant (in this case, a telephone exchange) would take precedence over the operation of mere equipment. Bearing in mind the type of area to be served and the evidence before the court, we do not feel that such a limited construction is realistic. The statute plainly says "plant or equipment," and does not limit the operation in the territory to merely a *plant*. So, also, we decline to read into the statute the type of exclusive language sought by Suburban and are of the opinion that Mountain States was first in the field or territory, operating equipment therein.

■■ In view of what we have said, it would appear that the factual situation as found by the trial court, and our construction of the statute, reach the following result: (1) The whole area of northern Catron County is one field or territory; (2) Mountain States had in operation in this field or territory equipment engaged in a service similar to that which Suburban sought to install; (3) Suburban's operation of the first exchange in the area at Quemado was "engaging in a similar service" to that which Mountain States already had

**420**

in operation; (4) Suburban, therefore, before it would have the right to operate in Quemado, or in any other part of the area involved, must have obtained a certificate of convenience and necessity as required under the statute. This it had not done. Therefore, Suburban not only fails to establish its right to an injunction, but, on the contrary, Mountain States, under its cross-appeal, should be determined to have been improperly denied its application for injunction. It must also follow, from our determination of the above questions, that that part of the court's judgment granting Suburban ninety days to furnish adequate service is improper and must be set aside. Of course, nothing said herein should be construed to prevent Suburban, should it desire, from applying for a certificate of convenience and necessity to offer duplicate service under the provisions of the statute. In this appeal, however, we do not reach the question of whether or not Suburban's present service in Quemado is inadequate.

The case on the main appeal will be affirmed, but reversed as to the cross-appeal, and remanded to the trial court with direction to enter a new decision and judgment in conformity herewith. It is so ordered.

COMPTON, C. J., and CHAVEZ and NOBLE, JJ., concur.

MOISE, J., having recused himself, not participating.